# Waynesboro Water Company, Appellant, *v.* The Public Service Commission.

*Public Service Commission — Public Service Company Law — Water companies—Boroughs — Acquisition of water company by borough—Proceeding before Public Service Commission for certificate of public convenience—Mandamus.*

The Public Service Commission has jurisdiction to determine whether the service, accommodation, safety and convenience of the public require the acquisition of the waterworks of a public service company by a municipality.

Under article III, section 3 (d), of the Public Service Company Law it is necessary for the borough to obtain a certificate of public convenience from the Public Service Commission, evidencing its approval, before a municipality can acquire, construct or begin to operate any plant or other facilities for the rendering to the public of any service, of a kind or character already being rendered by a public service company within the municipality.

Such action takes the place of the former procedure by mandamus, which was available to ascertain the probable price payable by the municipality for the waterworks, which it sought to acquire.

By substituting for the first mandamus proceeding, the application to the commission, the water company is deprived of no vested right. The legislature qualified the borough's absolute right to purchase, conferred by the Act of 1874, and provided another method by which the borough could obtain the information necessary to act in the first instance, but that legislation took nothing from the water company. It was not deprived of any property or of any right to possession or enjoyment of property. Those rights it may still assert and maintain, until confronted with what was formerly the second mandamus proceeding to compel the conveyance of the waterworks upon the payment of the price offered. At that time the defendant company could raise any issues of fact which it deemed essential to a proper determination of the case, and those issues, particularly those concerning the amount to be paid by the borough to the water company, would go to a jury, as in other instances where property is taken by the State or a municipality.


Argued October 24, 1921. Appeal, No. 120, Oct. T., 1921, from report and order of the Public Service Com-

mission of the Commonwealth of Pennsylvania In re
Application of the Burgess and Town Council of the
Borough of Waynesboro, Pennsylvania, for a Certifi-
cate of Public Convenience evidencing the Commis-
sion's approval of the acquisition of the plant of the
Waynesboro Water Company, and of the beginning of
the exercise of the right to operate said plant by supply-
ing water to the public in the Borough of Waynesboro,
Franklin County, Pennsylvania, and territory adjacent
thereto, Application Docket No. 2492, 1919.  Before OR-
LADY, P. J., PORTER, HENDERSON, HEAD, TREXLER, KELLER
and LINN, JJ.  Affirmed.

Application for a certificate of public convenience evi-
dencing the approval of the Public Service Commission
for the acquisition of the Waynesboro Water Company.

The facts are stated in the opinion of the Superior
Court and in the report and order of the Public Service
Commission, as delivered by Reed, Commissioner, part
of which is as follows:

In ascertaining whether the commission should grant
or withhold its approval of this application, the first
important question for determination is the net cost of
erecting and maintaining the works and property of the
company, with interest thereon at the rate of ten per
centum per annum deducting therefrom all dividends
theretofore declared.  The company oblivious of the fact
that its ownership of this water plant was a defeasible
one did not keep its accounts so that it could be definitely
and accurately determined therefrom what was the cost
of the original construction and subsequent mainte-
nance.  For the purpose of procuring this information
as certainly and definitely as it could be ascertained,
with other facts necessary to a determination of the case,
the parties agreed on an accounting conference, each to
select an accountant to act in conjunction with an ac-
countant representing the commission who was to be the
chairman of the conference.  It was agreed that the ac-

countant conference should report to the commission on the following matters:

(a) The net cost of erecting and maintaining the works and property of the company up to April 1, 1920, with interest thereon at the rate of 10% per annum, deducting from said interest all dividends theretofore declared, as provided for under clause 7 of section 34 of the Act of April 29, 1874, P. L. 73.

(b) The assessed valuation of the applicant's taxable property as of April 1, 1920, and its indebtedness at that date.

It was stipulated that if complete agreement by the members of the conference was found impossible they should agree upon such items as to which an agreement could be reached, and report disputed items to the commission, that either party should then be at liberty to produce further evidence on disputed items for the consideration of the commission; also that the conference did not extend to the consideration of any issues raised in the pleadings and not specifically referred to in the agreement for the conference, and that the accountants were not to pass upon any questions of law that might be raised at any time during the proceedings.

The accountants were unable to agree on the principal matters left to them to determine, and they severally reported their conclusions thereon to the commission, and thereupon a time for hearing was fixed and the testimony offered by the respective parties taken. Subsequently printed briefs were filed and oral arguments had, and the case as thus presented is now submitted to the commission for decision.

Apparently there is a wide difference between the members of the accounting conference as to the conclusions respectively reached, and yet with the exception of two items entering into the cost of original construction they are not so wide apart in their finding of the facts. The two items referred to relate to the amount of the capital stock of the respondent which it alleges and which the

applicant denies was turned over to the American Construction Company, Limited, as part consideration for original construction work. These items will be considered later in this report. The principal stockholders of the water company and of this construction company, which was a limited partnership, were the same individuals; the officers of the respective companies were the same, and the companies were practically owned and controlled by the same parties. A gas plant and the water plant were installed at the same time by this construction company, and the cost of their installation intermingled in one account so that the accountants were unable to segregate the items or to definitely determine the cost of construction of either plant. The report made by respondent's accountant is a compilation from the figures and data contained in the report made by the representative of the commission, and these reports are identical in their conclusions except that the respondent's accountant includes in his report the cost of certain repairs made to respondent's plant in the course of its operations with interest and excludes from the dividends declared the interest paid by respondent on its bond and other indebtedness. These reports show the cost of constructing the gas and water plants as originally installed, and as carried on the books of the American Construction Company, Limited, to be approximately $111,000. The applicant's accountant testified that he analyzed this account and it showed adjusting entries which reduced this cost to $97,775.94. The report filed by the accountant representing the commission, which was practically adopted by respondent's accountant, includes as the cost of original construction of the water plant alone the sum of $120,304.04. In this item is included capital stock of the water company of the par value of $72,500, alleged to have been issued to the American Construction Company, Limited, as part consideration for the construction of the water plant as originally installed. The applicant's accountant reports and testifies

that he ascertained the cost of original construction of the water plant to be $46,500, and the applicant's engineer filed a report, verified by his testimony, that its cost did not exceed $57,067.01, from which figure, for reasons stated in his testimony, he eliminated the cost of the pump plant, fire hydrant connections and service lines, and found that the total cost was $50,096.85, which sum tallies quite closely with the amount found by applicant's accountant, and if there is deducted from the $120,304.04, stated in the report adopted by respondent as the cost, the $72,500 of capital stock of respondent included in that sum, there would remain as the cost $47,804.04, or a figure that closely approximates the cost of the original installation as ascertained by the applicant's accountant and engineer and testified to by them. There is no evidence to warrant the conclusion that the two items, $27,500 and $45,000, aggregating $72,500 of the par value of the capital stock of respondent were turned over to or retained by the American Construction Company, Limited, as part consideration for the construction and installation of respondent's water system, although referred to in its contracts as part of the consideration to be received by it. Whatever the parties to those contracts had in mind when they made and executed them, the testimony in its entirety is not convincing that they intended the ownership of this stock should pass from respondent to the American Construction Company, Limited, as part consideration for construction and installing the water plant, and since as a fact it never did so pass it should be excluded from the cost of original installation.

The respondent company was incorporated in 1882 under the Act of April 29, 1874, and from the testimony and exhibits offered in evidence there appears to be substantial agreement between the parties as to the cost of betterments and additions made to the plant since originally installed. The report adopted by respondent shows the cost of erecting and maintaining the works and prop-

erty to April 1, 1920, was $296,533.60. This included the items of capital stock aggregating $72,500, which should be deducted, leaving the actual cost of erecting and maintaining the plant to April 1, 1920, $224,033.60. This is practically the figure arrived at by the applicant's accountant. It is contended that some capital charges should be added which have been omitted, namely: $266.67, paid the State as bonus on the capital stock, and $7,500.38 paid for engineering cost incurred pursuant to an order of the state commissioner of health requiring certain improvements to be made in respondent's water supply, which have not yet been carried to completion but which applicant will have the benefit of if it takes over the plant and proceeds to comply with the order of the State Board of Health. It appears that the bonus item of $266.67 was taken care of out of the cash paid in at the time the company was organized and has been allowed in the accountant's statement of fixed capital. The item of engineering costs is an aggregate one: $400 thereof was incurred in 1912; $622.27 in 1916; $848 in 1917, and $5,632.11 in 1919. Allowing this item of engineering expense we find that the cost of erecting and maintaining the works and property of respondent to April 1, 1920, is $231,535.98. To this sum respondent claims there should be added $10,507.77, as found by respondent's accountant, or $13,586 as found by applicant's accountant to have been expended for repairs made on the plant between the date of incorporation and April 1, 1920. These were the ordinary repairs made in the course of operating the plant, properly chargeable to operating expenses, and in our opinion do not come within the meaning of the term "erecting and maintaining" as used in the Act of 1874, for which an allowance can be made.

This leaves for consideration what if anything should be added for interest after deducting therefrom the dividends declared. In calculating interest the accountant for applicant counted interest from the end of the year

whereas respondent contends the calculation should be made from an equated date or middle of the year, and with this contention we agree. Neither method will produce exact results, but we incline to the opinion that an equated date for calculating interest is the one usually adopted. The total amount of the interest thus calculated amounts to $402,817.37.

The respondent's accountant ascertained the dividends declared in cash and stock to be $351,687.93. The applicant's accountant determined the amount to be $383,897.38. The difference between the accountants is due to the fact that the respondent's accountant allowed only $17,790.55 of a stock dividend of $50,000 declared in 1913. The applicant's accountant allowed the entire $50,000. The reason given by the accountant representing the commission, and accepted by respondent, for reducing this stock dividend from $50,000 to $17,790.55 is that the latter sum was the only amount declared from surplus of the company, the balance was declared upon a revaluation of the company's fixed capital which revaluation later by an adjusting entry on the company's books was reduced $32,209.45, and this amount he deducted in arriving at the amount of respondent's fixed capital. Upon this statement of the facts we accept the figure of $351,687.93 as the amount of the dividends declared. To this sum, however, must be added $48,521.45 of interest which by the same accountant was ascertained to have been paid by respondent on its bond and other indebtedness contracted in erecting and maintaining the plant, making the total amount to be deducted from the interest allowed at the rate of ten per centum per annum $400,209.38, which would leave $2,607.99 to be added to the $231,535.98 hereinbefore ascertained as the cost of erecting and maintaining the plant, making $234,143.97 which is hereby found and determined to be the net cost as of April 1, 1920, of erecting and maintaining the works and property of the respondent with interest thereon at

the rate of ten per centum per annum, deducting from said interest all dividends theretofore declared.

The respondent objects to the allowance of the interest payments amounting to $48,521.45 being added to dividends declared on the ground that such payments cannot be considered within the purview of the Act of 1874, which specifically names "dividends declared." If the company, however, is allowed interest at the rate of ten per centum per annum on the cost of erecting and maintaining its works and property which were installed and maintained out of the proceeds of a bond issue or other indebtedness contracted for that purpose, and no deduction is made for the interest paid on such indebtedness, the company would be getting more than ten per centum per annum on the cost of erecting and maintaining its plant. It may be that in legal parlance the terms "dividend" and "interest" have a different signification, but in a proceeding like this they should be considered as synonymous; otherwise the spirit of the Act of 1874 cannot be given effect. In our opinion the interest paid on bonds and other indebtedness entering into the construction of the plant as a capital charge, which interest would otherwise have been available for dividends, should be treated as part of the dividends to be deducted from the ten per centum per annum allowed on the cost of installing and maintaining the plant and accordingly is deducted as above stated.

The assessed value of applicant's taxable property April 1, 1920, was $4,445,436.66, and its indebtedness as of that date consisted of a bond debt of $225,500 and a floating debt of $5,180.99. It had in its sinking fund $9,184.78, and in its general account $627.45; it also owned and possessed $20,000 of Liberty bonds. It is contended that these Liberty bonds cannot be considered in the reduction of respondent's indebtedness. In the opinion of the commission they are such liquid assets as are readily available for that purpose and should be so considered, and therefore finds that applicant's net in-

debtedness April 1, 1920, was $200,868.76. Its borrowing capacity if confined to the constitutional limit of seven per cent on its assessed valuation would be only $110,011.80; but if the constitutional limit of ten per cent is made available under the Act of June 5, 1915, P. L. 846, it would have a borrowing capacity of $244,674.90. The latter sum exceeds the amount necessary to acquire the respondent's plant. The applicant, however, proposes to finance its acquisition of the property by providing a part of the purchase money from a straight municipal bond issue and part under the Act of 1915 which provides for a bond issue secured by lien upon the property acquired, and which would not constitute any part of the municipal indebtedness.

Assuming that the applicant has the right and will be able to exercise it in the manner proposed, we conclude and so find and determine that its acquisition of the respondent's plant, to be municipally operated, is necessary and proper for the service, accommodation and convenience of the public, and therefore an order will be made granting a certificate of public convenience as prayed for subject to revocation or cancellation if the rights thereby secured are not asserted and the respondent's water plant acquired in pursuance thereof on or before April 1, 1922.

Commissioner Rilling dissented.

*Errors assigned,* among others, were the refusal of the Public Service Commission to dismiss the petition for lack of jurisdiction, various findings of fact and the order of the commission.

*C. LaRue Munson,* of *Candor & Munson,* and with him *Omwake & Davison,* for appellant.—The Public Service Commission had no jurisdiction in this case: New Brighton Borough v. New Brighton Water Co., 247 Pa. 232, 237; Williamsport v. Citizens Water & Gas Co., 232 Pa. 232; Reynoldsville Borough v. Reynoldsville Water

Co., 247 Pa. 26; Huntingdon Borough v. Huntingdon Water Suppy Co., 258 Pa. 309.

The commission erred in its ascertainment of the value of the water works.

*Walter K. Sharpe,* and with him *John W. Hoke,* for Borough of Waynesboro, intervening appellee: Under the provisions of article III, section 3, paragraph (d) of the Public Service Company Law it was necessary to secure a certificate of public convenience evidencing the commission's approval of the borough's acquisition of the water works: New Brighton Borough v. New Brighton Water Co., and Beaver Valley Water Company, 247 Pa. 232; Bethlehem City Water Co. v. Bethlehem Borough, 253 Pa. 333, 337-8; St. Clair Borough v. Tamaqua & Pottsville Electric Ry. Co., 259 Pa. 463; Klein-Logan Co. v. Duquesne Light Co., 261 Pa. 526.

*John Fox Weiss,* Assistant Counsel, and with him *Frank M. Hunter,* Counsel, for the Public Service Commission.

OPINION BY LINN, J., March 3, 1922:

The principal question for decision is whether a borough, desiring to acquire the plant of a water company, incorporated in 1882, under the general incorporation Act of April 29, 1874, P. L. 73, must first apply to the Public Service Commission for a certificate of public convenience, pursuant to article III, section 3 (d) of the Public Service Company Law, or whether, before applying to the commission, the borough must use the procedure by mandamus which was available to ascertain the probable price payable for such water works prior to the effective date of the Public Service Company Law, January 1, 1914. The intervening appellee, Waynesboro, first applied to the commission and obtained such certificate. The water company appeals and attacks

the jurisdiction of the commission and its conclusions. We all agree that the commission has jurisdiction.

The record shows the Waynesboro Water Company, appellant, was incorporated in 1882 under the Incorporation Act of 1874, and shortly thereafter began supplying water to the public in Waynesboro. Section 34, clause 7, P. L. 95, of the Incorporation Act provides that "It shall be lawful at any time after twenty years from the introduction of water.......into any.......[borough] for the......borough......to become the owners of said works, and the property of said company, by paying therefor the net cost of erecting and maintaining the same, with interest thereon, at the rate of ten per centum per annum, deducting from said interest all dividends theretofore declared......" That power "to become the owners" confers upon the borough "the interest of one possessed of a prima facie right......to acquire the property......" (Williamsport's Case, 232 Pa. 232, 243), and imposes an obligation to sell upon any water company created under the act. While the sum payable could not be stated in the statute, the measure thereof is prescribed so that "The result is one of computation; there is no room for discretion or judgment which may be exercised under one form of proceeding as well as another. Both the contracting parties must be conclusively presumed to have had in view the law which empowered them to contract, and which became part of the contract. At the end of twenty years the defendants have a right to take the works at a price fixed by the law, and that is one of computation": White v. Meadville, 177 Pa. 643, 655.

Desiring to exert its right to purchase the property from the water company, the borough passed an ordinance approved in July, 1918, reciting that it "desires to become the owner of the plant......and to acquire the same as provided by the [Act of 1874] provided sufficient funds to pay for the same can be raised by bond issue as provided by existing laws, and provided the

Public Service Commission......shall approve......"
The ordinance authorized the officers of the borough "to take any and all steps preliminary to the acquisition of the said plant......"

Pursuant to that authority, the borough filed a petition with the commission praying for a "certificate of public convenience under article III, section 3 (d) and article V, sections 18 and 19" of the statute, evidencing the commission's "approval of the acquisition, construction and beginning of the exercise of the right to operate" appellant's plant.    To that petition, the water company filed an answer challenging the jurisdiction of the commission and putting certain facts in issue.    The commission heard the evidence offered by both parties, filed its report and issued its certificate.    From the evidence, it made a computation as of April 1, 1920, (a date agreed upon) that the cost of erecting and maintaining the plant after adding interest and deducting dividends as specified in the statute, was $234,143.97.    It found that the borough had a borrowing capacity of $244,-674.90, and concluded as follows: "Assuming that the applicant has the right and will be able to exercise it in the manner proposed, we conclude and so find and determine that its acquisition of the respondent's plant, to be municipally operated, is necessary and proper for the service, accommodation and convenience of the public, and therefore an order will be made granting a certificate of public convenience as prayed for subject to revocation or cancellation if the rights thereby secured are not asserted and the respondent's water plant acquired in pursuance thereof on or before April 1, 1922."
The water company then took this appeal from the order issuing the certificate pursuant to the commission's report.

Appellant contends the commission has no jurisdiction at this stage; its learned counsel says "the old practice remains [by which a borough acquired such waterworks] but added to the former requirements, is, that

the municipality must now secure the consent of the commission before it acquires the plant of a water company." What then was the practice so referred to?

It has been observed that the act itself furnishes no method for making the computation; it merely states the measure, and it is conceivable that a water company required to sell, may agree without litigation, on the price to be paid by the borough. It was, however, determined in Williamsport's Case, 232 Pa. 232, that the "old practice" to "estimate the price......it would have to pay for the works" was by proceeding for mandamus, and it is the rule of that case that if a borough shows that its borrowing capacity approximates the probable price it may have to pay (page 251) a mandamus will issue requiring the water company to submit its books, papers, etc., to the borough for the purpose of estimating the price payable; that procedure was called the first mandamus proceeding (page 248), and Reynoldsville Borough v. Water Co., 247 Pa. 26, is an instance of its application. Should the water company refuse to sell, on being offered the price computed in the first proceeding "the next step would be the application for another writ of mandamus to compel the conveyance of the waterworks, etc., upon payment of the price offered. The defendant could then raise any issues of fact which it deemed essential to a proper determination of the case, and the issues, particularly those concerning the amount to be paid by the city to the water company, would go to a jury, as in other instances where property is taken by the state or a municipality": 232 Pa. 248. It would thus appear that the price which the water company must accept, is determined in the proceeding to compel the conveyance, and not in the first mandamus proceeding. The procedure was again considered by the present Chief Justice in New Brighton Borough's Case, 247 Pa. 232, in which he repeated "that in cases of this character two mandamus proceedings may be necessary. The second, if required, is to compel a transfer of the

plant in question for a price to be then and there determined......": 247 Pa. 237. He also said "Under our established practice the first mandamus is the initial step in the taking over of waterworks by a municipality and its office is simply to get at the sources of information required to enable the borough to act intelligently and finally to determine whether or not it will make the purchase; after securing this information, however, if the municipal authorities see fit, they may abandon entirely their expressed desire to acquire the property under consideration." (page 237.)

Appellant's contention that the "old practice remains," therefore apparently means, that before the borough may apply for a certificate of public convenience, it must resort to the first mandamus proceeding for the purpose stated. The borough's answer to that contention is that the Public Service Company Law makes certain requirements of municipalities, before they may avail themselves of the right to acquire the property of such water companies, and that compliance with those requirements involves the ascertainment of the price to be offered, with the same result and effect formerly had by the first mandamus proceeding; that as the borough obtains the necessary information in the investigation made by the commission, there is no occasion also to have the first mandamus proceeding; and that resort to proceedings in mandamus is now inevitable only if the water company refuses to accept an offer of the price so determined by the commission, leaving for determination in this mandamus proceeding (formerly the second mandamus) all the issues therein determinable as they were prior to the enactment of the Public Service Company Law. The borough supports its contention in this respect by what is said upon the subject in the Reynoldsville and New Brighton cases. Though both those decisions were rendered in proceedings begun before the effective date of the Public Service Company Law, in the Reynoldsville case, the Supreme Court affirmed the is-

suance of the writ (in the first mandamus proceeding)
but made the following statement now pertinent: "An-
other objection urged· by the appellant is, that the pro-
ceeding to take over the property of the water company
was without the approval of the Public Service Commis-
sion first had and obtained, as required by article III of
the Act of July 26, 1913, P. L. 1374. In answer to this
it is only necessary to say that by the express terms of
this act it did not take effect until the 1st of January,
1914. At that date the present·proceeding was pending,
it having been instituted on the law side of the court
8th September, 1913. It is a mistake to suppose that the
act merely effected a change in procedure and was there-
fore retroactive. It operated directly upon the rights of
a municipality by qualifying its right to acquire at its
own pleasure the property of a water company within its
limits, and therefore it can only be allowed retroactive
effect as such a result is expressly declared in the act
itself."

In the opinion in the New Brighton case, quashing
the proceeding, the present Chief Justice said concern-
ing the effect of the Public Service Company Law upon
future proceedings to acquire the property there under
consideration: "we take occasion to state that any new
efforts made by the plaintiff borough to take over these
waterworks will be subject to the provisions of that
statute.

"One of the purposes of the Utilities Act was to fur-
nish in cases of the character of the one now before us, a
more flexible procedure for ascertaining facts and reach-
ing conclusions than were supplied by the set forms of
pleading and procedure in the law courts. Article III,
section 3 of the statute, provides that upon the approval
of the Utilities Commission, evidence by its certificate
of public convenience 'first had and obtained,' and upon
compliance with existing laws 'and not otherwise,' it
shall be lawful '(d) for any municipal corporation to
acquire......any plant.......for rendering or furnish-

ing to the public of any service of the kind or character
already being rendered or furnished by any public serv-
ice company within a municipality'; Article V, section
18, provides that 'when application shall be made to the
commission by any municipal corporation for the ap-
proval required by the provisions of Article III, section
3, (d)......such approval......shall be given only and
when said commission shall find or determine that the
granting or approval of such application is necessary or
proper for the service, accommodation, convenience, or
safety of the public'; and Article V, section 19, provides
the machinery for making proper investigations—it
grants power to the commission to subpœna and compel
the attendance of witnesses and the production of books,
papers and contracts, etc., and 'to make such inquiries,
physical examinations, valuations, and investigations as
it may deem necessary.' See also section 23 as to valu-
ations, and section 29 [of article VI] concerning the
right to an appeal and to an ultimate trial by jury of
issues of fact 'where such right is secured either by the
Constitution of the Commonwealth or of the United
States.' On the whole, this act furnishes a complete and
what should prove a satisfactory system in cases of this
character, and thereunder all the relevant facts in pos-
session of the New Brighton Company or the Beaver
Valley Company can be brought out and fully developed,
and the rights of all parties conserved; therefore, since
the approval of the commission must be first 'had and
obtained' before the present plant can be actually ac-
quired or operated by the borough, application should
be made to that body before any future proceedings,
mandamus or otherwise, are instituted in the courts."

It is clear that if the Public Service Company Law
"operated directly upon the rights of a municipality by
qualifying its right to acquire at its own pleasure the
property of a water company......" (supra) a borough
may not require the sale except in conformity with that
qualification; and if that require the commission's ap-

proval, as was said in the New Brighton case "before any future proceedings, mandamus or otherwise are instituted in the courts," the contention of the appellee would seem sound. The argument based on convenience leads to the same result; if the commission's investigation advises the borough sufficiently "to act intelligently and finally to determine whether or not it will make the purchase" (supra) there is no occasion to get the same information again in a mandamus proceeding.

By substituting for the first mandamus proceeding the application to the commission, the water company is deprived of no vested right. The legislature qualified the borough's absolute right to purchase, conferred by the Act of 1874, and provided another method by which the borough may obtain the information necessary to act in the first instance, but that legislation took nothing from the water company. It was not deprived of any property or of any right to possession or enjoyment of property. These rights it may still assert and maintain, until confronted with what was formerly the second mandamus proceeding; for then, as was said in Williamsport's Case, 232 Pa. 248, "should an offer of that price be refused the next step would be the application for another writ of mandamus to compel the conveyance of the waterworks, etc., upon payment of the price offered. The defendant could then raise any issues of fact which it deemed essential to a proper determination of the case, and the issues, particularly those concerning the amount to be paid by the city to the water company, would go to a jury, as in other instances where property is taken by the state or a municipality": see New Brighton's Case, 247 Pa. 232 at 237.

As nothing has been done in this case interfering with any right to trial by jury which the water company may have, we consider appellant's contention to that effect, without merit.

Equally without merit is the claim that "before the commission can take jurisdiction" it must appear "that

the borough has elected to purchase the plant." The act provides that without the commission's certificate "first had and obtained," a borough may not "acquire...... any plant......etc." (article III, section 3), and that "when application shall be made......by any municipal corporation for the approval required by the provisions of article III, section 3 (d)......such approval...... shall be given only if and when the said commission shall find or determine that the granting or approval of such application is necessary or proper for the service, accommodation, convenience or safety of the public": article V, section 18. The same article provides in section 19, that "to make such finding or determination it shall hold such hearings......and examine such witnesses and compel the production of and examine such books, papers, contracts or other documents and make such inquiries, physical examinations, valuations and investigations as it may deem necessary or proper in enabling it to reach a determination......"

Considering the uncertainty of the price to be paid, whether when ascertained, it can be borrowed, and the difficulty, labor and expense of determining those two essential elements before applying to the commission for its certificate, as well as the requirement that the commission make its own investigation substantially into the same matters, formerly considered in the first mandamus proceeding, it seems reasonable to conclude that it was not the intention of the legislature to require any greater election by a borough to purchase, before applying to the commission, than was formerly required of a borough when beginning its first proceeding for mandamus; and it had been settled that after the price was ascertained in the first mandamus proceeding, a borough might "abandon entirely their expressed desire to acquire the property under consideration," (247 Pa. 237). The record shows sufficient action by the borough for the purposes of the application.

We are then brought to two other contentions made by appellant: first,—that the commission erred in computing the amount found to be the cost of erecting and maintaining the plant, and in ascertaining the sum to be deducted as dividends declared from the interest at ten per cent per annum specified in the statute; and second, —that it erred in determining the borrowing capacity of the borough.

We are constrained to hold that the application of the law to the facts properly deducible from the testimony shows that the probable price payable, and the borrowing capacity of the borough are both different from the amounts found by the commission. The difficulty in finding the probable price results largely from the failure of the water company to keep the records contemplated by the statute "so that the borough might, at the proper time, make such investigation as would enable it intelligently to exercise its privilege of purchase": 247 Pa. 240. For part of the period the water company could produce no records; for part, the records were plainly inconsistent with others available to check them; for part, capital entries in its books were based on estimates by the company which the witnesses considered too low, though disagreeing in amount; they also differed as to the dividends declared. We also think the borrowing capacity is in excess of the amount found.

The question then arises, is the error harmless? These proceedings have supplied the borough with the information necessary to decide whether to purchase the waterworks or to abandon the project, and we assume the borough would have decided that question, had this appeal not been taken. The borough cannot now be deprived of the information; it knows what the water company's books show, but the information will not furnish the basis of proceedings to compel conveyance, unless the borough retains the certificate of public convenience issued in this proceeding. Shall we then return the record to have the commission consider whether in

the light of our conclusions as to the legal effect of the evidence on the probable price and the borrowing capacity as found by the commission, it will adhere to its determination that on the whole record the certificate should issue?    Whether the service, accommodation, convenience or safety of the public require what this certificate permits, is an administrative matter; we have therefore concluded that our consideration need proceed no further than to see that the record contains evidence to support the order of the commission.    We all agree there is such evidence, and that no harm to appellant can result from our conclusion, because it is not obvious that a restatement of the accounts based on the inferences we make from the figures in evidence, would produce such substantial change in the relation of the ultimate totals as to justify our holding that the order appealed from was not "reasonable and in conformity with law" within article VI, section 22, P. L. 1427.

If proceedings to compel conveyance follow, and are resisted by the water company, the contentions suggested in appellant's argument concerning the cost of erecting and maintaining the waterworks, the interest, the dividends declared, the borrowing capacity of the borough and any other issues involved, will, or may be tried; the evidence may or may not be the same as appears in this record, and the appeal, if any, from the judgment then entered, will be to the Supreme Court and not to this court.    In view of those considerations, we deem it undesirable now to indicate why we differ from the commission as to the legal effect of the evidence apparently the basis of its findings in the respects specified.

Concerning the two remaining contentions, we need only say that as we perceive no reason in this record for differing from the commission in its administrative consideration of the future requirements to extend the waterworks, we need not discuss it; and as the constitutionality of the amendment to the Constitution may

be raised in the proceeding to compel conveyance of the waterworks, if brought, we need not now consider it.

The order of the commission is affirmed and the appeal is dismissed at appellant's costs.